Ronald DOMINIQUE, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT
SERVICES, Respondent,

Washington Metropolitan Area Transit
Authority, Intervenor.

No. 88–1442.

District of Columbia Court of Appeals.

Argued April 4, 1990.

Decided May 16, 1990.

Joan Harvill, for petitioner.

Martin B. White, Asst. Corp. Counsel,
Chevy Chase, Md., with whom Herbert O.
Reid, Sr., Acting Corp. Counsel, and
Charles L. Reischel, Deputy Corp. Counsel,
Washington, D.C., were on the Memoran-
dum in Lieu of Brief, for respondent.

Gary L. Crawford, Gaithersburg, Md.,
for intervenor.

Before ROGERS, Chief Judge, and
NEWMAN and FARRELL, Associate
Judges.

NEWMAN, Associate Judge:

Ronald Dominique entered into a lump-
sum settlement agreement of a worker's
compensation claim with his employer,
Washington Metropolitan Area Transit Au-
thority ("WMATA"), one of the conditions
of which was that he resign his position as
a bus driver. After receiving the settle-
ment, Dominique filed a claim against
WMATA with the Department of Employ-
ment Services ("DOES"), charging that the
requirement that he resign as a condition
of receiving a lump-sum settlement consti-
tuted a retaliatory discharge under D.C.
Code § 36–342 (1988 Repl.). The Hearing
Examiner ruled that the resignation re-
quirement was a retaliatory discharge as a
matter of law and ordered reinstatement
with back pay. On appeal, the Director
reversed on grounds that the Hearing Ex-
aminer's legal conclusion was erroneous
and ordered reinstatement of the settle-
ment agreement. Dominique appeals from
the Director's legal ruling that an employer
does not commit a retaliatory discharge, as
a matter of law, by requiring an employee

to resign as part of a settlement agreement. Because the Director's legal ruling is not unreasonable in light of the prevailing law, inconsistent with the statute, or plainly erroneous, we affirm.

## I

Ronald Dominique joined WMATA as a bus driver in 1979, following his discharge from the U.S. Marine Corps. In a brutal attack in February 1983, his throat was slit from ear to ear by a bus passenger wielding a razor. The wound required 176 stitches, and the experience caused Dominique to suffer what his treating psychiatrist, Dr. James Ryan, diagnosed as "acute stress disorder." Dominique was placed on temporary total disability. After undergoing psychiatric treatment for his stress syndrome, Dominique returned to his duties in August 1984. In November 1984, he was again assaulted by a passenger; this time a man struck him in the chest with a full can of beer. He suffered a recurrence of his stress disorder and was again placed on temporary total disability.

Throughout this period, dating from about a week after his initial injury, Dominique was represented by experienced legal counsel. Within a few months of that first injury, Dominique told counsel that he was anxious to reach a settlement agreement with WMATA, leave the company, and begin a new life based on some two years of college and a nascent career in professional boxing. However, according to the testimony of Dominique's then-counsel, all efforts at reaching a settlement were blocked by Dominique's second injury, which created the possibility of a separate claim and injury fund.[1]

From November 1984, following the second assault, until October 1986, when a settlement agreement was reached between Dominique and WMATA, Dominique remained under the care of Dr. Ryan for his stress disorder. Throughout this entire period, Dr. Ryan expressed the opinion that

due to the stresses and pressures of the job Dominique should not return to his position as a bus driver, but rather should seek another form of employment. This opinion was echoed by other psychiatrists who examined Dominique during this period. One of them, Dr. Joseph Tarantolo, made this dire prediction in a report dated June 3, 1985:

> I think no amount of therapy will be enough to correct the serious underlying personality deficits in Mr. Dominique to the point of his being able to take on the interpersonal stress of inner[ ]city bus driving. As I stated in my first report, it would be dangerous both to him and to Metro passengers to put this potentially explosive person back into the Metro driver seat. He tells it quite succinctly, "Either someone will kill me or I will kill them." At best it would be a waste of time and money since failure would be likely should he return. He tried to return. No one was killed or permanently maimed. Let's consider that fortunate.

Another examining psychiatrist, Dr. Brian Schulman, writing in a March 8, 1986 report, said:

> I do not believe that he is disabled on the basis of a phobia or a post-traumatic stress disorder. His psychiatric impairment lies in his poorly sublimated anger and the dire need for reparation for the assault ... Simply stated, he can no longer cope actively with inner city driving, simply because he cannot assume the passive, nonreactive role essential for operators who are capable of stabilizing and not escalating potentially provocative situations ... It is my conclusion that this person is highly unsuitable for any position that would place him in a provocative situation with the general public where issues of authority become manifest.

WMATA paid disability benefits to Dominique until March 1986, when it refused to continue the payments on grounds that Dominique was not cooperating with job

---

**1.** According to the testimony of Mark Brice, Esq., who represented Dominique in the settlement negotiations with WMATA, the possibility of a second injury fund will prevent settlement of the first injury fund, because the second injury fund cannot be settled unless it can be determined where the effects of the first injury stop and the effects of the second injury begin.

placement rehabilitation efforts. At that time he was still under the care of Dr. Ryan for stress disorder. Dr. Ryan, who was then of the opinion that Dominique would never be able to return to work as a bus driver, had not released him to return to work.

In April 1986, Dr. Ryan released Dominique to return to light duty. That same month, Dominique secured a part-time position as a clerk in a liquor store at a salary of $45 per week. His pre-injury salary was $546.40 per week.

Without his WMATA benefits and making only $45 per week, Dominique fell behind on his financial obligations. He soon found himself behind on his rent, car payments, and credit card accounts. Then, in May 1986, Dr. Ryan issued a report stating that Dominique's second injury had not created a "new" stress disorder or greatly exacerbated Dominique's existing disorder. This report removed the possibility of a second injury fund and thus cleared the way for settlement negotiations.

Once again Dominique pressed his counsel to obtain a settlement. Settlement negotiations were carried on with WMATA from August through October 1986. The result of these negotiations was a proposed settlement agreement; under its terms, Dominique would receive a lump-sum payment of $25,000 in exchange for releasing WMATA from further medical and legal claims and voluntarily resigning his position with WMATA.

On September 8, 1986 counsel for WMATA wrote to counsel for Dominique as follows:

> As I have previously advised, the employer did not have any interest in settling this claim while the Claimant was employed at WMATA. Upon your representation, however, that the claimant had or was going to voluntarily submit his resignation from employment at WMATA[,] I was able to secure the necessary settlement authority to meet your client's demand. You are not, however, authorized to submit this [S]ettlement Petition to [the Office of Worker's Compensation, "OWC"] for approval until such time as I am in receipt, from you, of the document verifying your client's resignation from WMATA. If this Petition is submitted prior to my receipt of that resignation, I and the employer will consider it null and void. Once I receive the resignation, and have it in my hand, I, or my representative, will provide you with the appropriate authorization to file this [S]ettlement Petition.

Counsel for Dominique responded on September 23 by forwarding Dominique's letter of resignation, which read as follows:

> I, Ronald H. Dominique, want to resign my position with WMATA as a Operator to further my education and my career as a professional boxer.

The Settlement Petition was then submitted to OWC, pursuant to D.C.Code § 36–308(f) (1981) (current version at D.C. Code § 36–308(8) (1989 Repl.), in October 1986. The Settlement Petition, which did not mention the requirement that Dominique resign his petition as a condition of the agreement, was approved by the OWC on October 17, 1986.

In November 1986, Dominique reported to a WMATA physician, apparently claiming to be a current employee seeking reinstatement. He was cleared to return to work and operated a bus during the months of November and December 1986 and January 1987. In January, WMATA officials discovered that Dominique was again driving a bus. They wrote to him to remind him of his resignation and to order him to cease driving WMATA busses and to stay off of WMATA property.

Dominique consulted new counsel, who filed a claim of retaliatory discharge against WMATA on his behalf, asking for reinstatement and back pay. Dominique's theory was that by requiring him to resign in order to receive his lump-sum settlement payment, WMATA had committed a retaliatory discharge within the meaning of D.C. Code § 36–342. Dominique did not ask to have the settlement agreement set aside. Thus, it appears that Dominique was seeking to retain the $25,000 given to him in the settlement agreement in addition to reinstatement and back pay.

A hearing was held in which testimony was taken from Dominique and counsel who had represented him in the settlement agreement. The Hearing Examiner found that Dominique had been required to resign as a condition of the settlement agreement and remanded the case to OWC to "reconsider its approval of the settlement agreement in light of the finding that claimant was required to resign his employment as a condition of receiving his Workers' Compensation lump sum payment." On April 5, 1988, OWC advised the Hearing Examiner that it would not have approved the settlement agreement had it included the requirement that Dominique resign. The Hearing Examiner then issued a May 4, 1988 Compensation Order finding that Dominique had been required to resign as part of the settlement agreement and that as a matter of law this requirement constituted a retaliatory discharge under § 36–342. The Hearing Examiner ordered reinstatement with back pay.

This order was appealed to the Director and, on October 26, 1988, the Director reversed and remanded for reinstatement of the settlement agreement. The Director ruled that, as a matter of law, "requiring a claimant to resign his employment as a condition of a voluntary settlement of a worker's compensation claim does not constitute an act of retaliation that is prohibited by D.C.Code § 36–342, particularly in an instance where a claimant is represented by counsel at all critical stages, as was the case here." *Dominique v. WMATA*, H & S No. 87–646 (Remand Order dated October 26, 1988). This appeal followed.

## II

■ The sole issue before us is whether the Director erred in ruling that an employer who requires an employee to resign as a condition for receiving a lump-sum settlement does not commit a retaliatory discharge as a matter of law under D.C.Code § 36–342.[2] Unless it is unreasonable, a legal interpretation given to a statute by the administrative agency charged with its enforcement should receive our deference. *Kramer v. D.C. Dep't of Employment Servs.*, 447 A.2d 28 (D.C.1982). In our view, the Director's ruling is not "unreasonable in light of the prevailing law, inconsistent with the statute, or plainly erroneous," *Public Employee Relations Bd. v. Washington Teachers' Union Local 6, AFT*, 556 A.2d 206, 207 (D.C.1989), and, therefore, deserves our deference. *Powers v. D.C. Dep't of Employment Servs.*, 566 A.2d 1068, 1069 (D.C.1989); *Dyson v. D.C. Dep't of Employment Servs.*, 566 A.2d 1065, 1067 (D.C.1989). Moreover, the ruling is narrowly tailored to prevent overreaching by employers who would seek to coerce employees into settlement arrangements, thus preserving for employees the protections afforded them under D.C.Code § 36–342.

As a matter of public policy, settlements are encouraged and, like any other type of contract, they are binding on the parties when valid. *Gabrielian v. Gabrielian*, 473 A.2d 847 (D.C.1984). Settlements cannot take place without a *quid pro quo*. The claimant must be willing and able to waive his or her rights under the Workers' Compensation Act or there will be no incentive for employers to come to such agreements. Once a claimant, acting in accord with the advice of experienced counsel, agrees to waive such rights in return for a lump-sum and receives that sum, it is entirely reasonable for the Director to conclude that, as a matter of law, the employer does not "re-

**2.** Regarding the merits of Dominique's retaliatory discharge claim, the Director did not rule on whether Dominique had met his burden of showing that WMATA had acted out of an illegal motive to retaliate against him for having filed a worker's compensation claim. *Lyles v. DOES*, 572 A.2d 81, 84 (D.C.1990). *See, also, Geddes v. Benefits Review Bd., U.S. Dep't of Labor*, 236 U.S.App.D.C. 381, 384, 735 F.2d 1412, 1415 (1984) (elements of a meritorious complaint under § 49 of the LHWCA are (1) employer must commit discriminatory act, and (2) the discriminatory act must be motivated by animus against the employee because of employee's pursuit of his rights under the Act); 2A A. Larson, WORKMEN'S COMPENSATION LAW § 68.36(c) (1989). Given the Hearing Examiner's ruling, that issue was not before her. However, the Director did observe that on this record the employer could have articulated a legitimate basis for insisting that Dominique resign as a condition of settlement.

taliate" against the claimant by reaping the benefits of the agreement.

■ The Hearing Examiner's position would have created a *per se* rule invalidating any settlement agreement requiring the claimant to resign. The Director could reasonably conclude that such a rule is contrary to public policy, because it would unreasonably restrict the ability of employers and claimants to enter into settlement agreements. *See generally Gabrielian, supra,* 473 A.2d at 847. That is especially true where, as the Director properly found to be the case here,[3] the claimant was represented by experienced counsel,[4] was fully informed of the terms of the agreement,[5] and there were legitimate reasons for the employer to require resignation as a condition of settlement and for the employee to accept such condition.[6]

### III

■ Dominique also contends that the settlement agreement must be set aside, thus allowing him to withdraw his resignation, because he entered the agreement under duress. Citing mounting financial pressures during the period when he was negotiating a settlement with WMATA, March through October 1986, Dominique contends that WMATA used its superior "bargaining power" to force him to write a letter of resignation. He further contends that he did not realize that he would have to resign in order to receive benefits under the settlement agreement. As appellate counsel conceded at oral argument, Dominique did not ask that the settlement agreement be set aside below.[7] Therefore, we will not hear this issue on appeal.

### IV

For the aforementioned reasons, the Director's decision is

*Affirmed.*

---

3. The Director's findings of fact are binding upon us, unless they are unsupported by substantial evidence in the record. *Proulx v. Police & Firemen's Retirement & Relief Bd.,* 430 A.2d 34, 35 (D.C.1981). Substantial evidence means "more than a mere scintilla" and such that reasonable minds might accept it as adequate to support a conclusion. *Vestry of Grace Parish v. D.C. Alcoholic Beverage Control Bd.,* 366 A.2d 1110 (D.C.1976). The Director's findings, detailed in the text and notes that follow, well exceed this standard and must be upheld.

4. Dominique was represented by Mark J. Brice, Esq. of Koonz, McKenney & Johnson, who testified that at the time of the hearing he had been handling workers' compensation cases exclusively for eight years. He estimated that during that time he had handled approximately 1,000 workers' compensation cases. Moreover, Brice stated that employees with claims against WMATA were his firm's "number one source of clients."

5. Brice testified that he went over the terms of the agreement with Dominique before the agreement was filed with OWC, including the requirement that he resign as a condition of receiving the settlement figure. According to Brice, he held "numerous" discussions with Dominique concerning resignation between July and October 1986.

Brice also testified that he still knew Dominique's phone number "by heart," whereupon he gave it correctly. Brice stated that Dominique had Brice's private direct line and used it "frequently" to contact Brice, a statement which Dominique confirmed.

6. The record indicates that, for WMATA's part, the prognosis offered by the psychiatrists made it reasonable for the company to seek Dominique's resignation. The record also indicates that, for Dominique's part, there were several good reasons to resign, including (1) the therapeutic concern expressed by his treating psychiatrist that he put the case behind him and start over in a new career; (2) the judgment of three psychiatrists that he would never be fit to return to work as a bus driver; (3) his own expressed desire to leave WMATA and pursue goals in boxing and higher education; and (4) the fact that the nature of his injury entitled him only to compensation for lost wages, so that if he were to return to work as a bus driver, his benefits would terminate.

7. At oral argument, appellate counsel also suggested that Dominique might have sought to set aside the settlement agreement under D.C.Code § 36–308(8) (1988). We express no opinion on this issue, as it is not before us.