WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT SER-
VICES, Respondent,

Cathy M. Davis, Intervenor.

No. 97–AA–510.

District of Columbia Court of Appeals.

Argued June 9, 1998.
Decided July 23, 1998.

Michael D. Dobbs, for petitioner.

Diane Fruchter, Fairfax, VA, for intervenor.

Jo Anne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for respondent.

Before FARRELL and REID, Associate Judges, and GALLAGHER, Senior Judge.

FARRELL, Associate Judge.

Washington Metropolitan Area Transit Authority (WMATA) seeks review of a decision of the District of Columbia Department of Employment Services (DOES) awarding intervenor Cathy M. Davis widow death bene-

fits and a ten percent penalty payment and denying WMATA a credit against pension and private life insurance benefits already received by Ms. Davis.

A DOES hearing examiner concluded that: (1) Ms. Davis was entitled to widow death benefits "in that she and decedent were living apart for a justifiable cause and she was dependent upon him for support at the time of death"; (2) WMATA was not entitled to a credit against benefits Ms. Davis received because the pension plan was not solely funded by WMATA and the life insurance policy was not part of an ERISA retirement plan; (3) Ms. Davis was not entitled to any penalty for bad faith for WMATA's failure to pay death benefits; and (4) Ms. Davis was entitled to a ten percent penalty for WMATA's failure to file a timely notice of controversion.

On appeal, the Director of DOES affirmed the award of death benefits, concluding there was substantial evidence in the record to support the finding that Ms. Davis was dependent on her deceased husband for support.[1] The Director also concluded that WMATA was not entitled to a credit against benefits because there was no statutory basis for a set-off for the life insurance policy, and the pension benefits were from a plan not funded solely by WMATA. Finally, the Director implicitly affirmed the penalty award for late notice of controversion.

We sustain the Director's conclusion that Ms. Davis was entitled to death benefits and the ten percent penalty award, and the conclusion that WMATA is not entitled to a credit for the life insurance proceeds. However, in keeping with our decision in *Mushroom Transp. v. District of Columbia Dep't of Employment Servs.*, 698 A.2d 430 (D.C. 1997), we reverse and remand to the Director for further consideration of whether WMATA may receive a credit for Mr. Davis's pension benefits.

## I.

Harry Davis, Jr. was a police officer employed by WMATA. In December 1993, during a routine traffic stop, he was shot and killed. He was survived by his wife, Cathy Davis; their son Derrick; and a son by his first marriage, Donnell Davis. After purchasing a home in 1981, the Davises began having domestic problems which sometimes resulted in violence by Mr. Davis toward his spouse and Derrick.

In September 1990, Mr. Davis, an army reservist, went to the Middle East during Operation Desert Storm. Ms. Davis and Derrick moved from the family home in Maryland to Florida, in part to be closer to Ms. Davis's family and two older children. Ms. Davis filed for legal separation but did not serve her husband with the papers. When Mr. Davis returned from the Middle East in June 1991, he moved to Florida to live with his wife and son.

Ms. Davis asked her husband to leave Florida in August 1992 because she feared he would become physically abusive again and thought Derrick would harm his father. During visits to Florida by Mr. Davis in October 1992 and in March 1993, the couple had sexual relations and discussed reconciliation. Throughout the period of separation, the Davises spoke on the phone two to three times a week and discussed reconciliation.

Ms. Davis filed for divorce in May 1993 and served Mr. Davis in October 1993 because she was "trying to ... pressure ... Harry to get help." She was never served with his response, although she found it in his papers after his death. Ms. Davis was planning to visit her husband in Maryland to discuss reconciliation, but he died in December 1993 before she got the chance.

The year before Mr. Davis's death, Ms. Davis earned $18,000 and Mr. Davis earned roughly $43,000. After the couple separated in August 1992, Mr. Davis sent monthly payments to Florida ranging from $300 to $450. According to Ms. Davis's testimony, in some months she would have been unable to pay her monthly expenses without financial help from her husband, and she had no savings or investments at the time Mr. Davis died. Despite their separation, Ms. Davis remained

---

1. The Director therefore did not reach the hearing examiner's alternative basis for awarding Ms.     Davis death benefits.

the primary beneficiary of Mr. Davis's will, and his life and accident insurance plans and pension benefits which were funded jointly by Mr. Davis and WMATA.

## II.

The District of Columbia Workers' Compensation Act (WCA or the Act) provides that compensation "known as a death benefit" shall be payable to "a widow ... [and or] a surviving child or children." D.C.Code § 36–309 (1997). A widow is defined as "the decedent's wife ... living with or dependent for support upon the decedent at the time of his death; or living apart for justifiable cause or by reason of his ... desertion at such time." D.C.Code § 36–301(20). The hearing examiner concluded that Ms. Davis was entitled to death benefits as Mr. Davis's widow in that they were living apart for justifiable cause and she was dependent upon him for support at the time of death. Upon review, the Director did not reach the first ground, concluding that substantial evidence supported the hearing examiner's finding that Ms. Davis depended upon Mr. Davis for support at the time of his death, hence qualified for death benefits.

▐ Like the Director, this court must sustain the examiner's finding of dependency if it is supported by substantial evidence in the record as a whole, even if there is evidence supporting a contrary conclusion. *See, e.g., Dell v. Dep't of Employment Servs.,* 499 A.2d 102, 108 (D.C.1985). WMATA argues that, contrary to the examiner's finding, Ms. Davis was not financially dependent upon her husband at the time of his death since the money she received from him was for the support of his son, not her, and just before the time of his death, her income was greater than her expenses. The record does not tell us whether Mr. Davis furnished support to his wife during his tour of duty in the Middle East nor how much support he provided upon his return, before separating from Ms. Davis in mid–1992. But the examiner and the Director credited evidence in the record that between November 3, 1992 and December 14, 1993, Mr. Davis sent twelve support payments of $300 to $450 to Ms. Davis, and that Ms. Davis would not have been able to

pay her monthly bills consistently without those payments. There were also, admittedly, periods when Ms. Davis's own income exceeded her expenses, but as Professor Larson has explained:

> Proof of actual dependency does not require a showing that the claimant relied on the deceased for the bare necessities for life and without his contribution would have been reduced to destitution; it is sufficient to show that the deceased's contributions were looked to by claimant for the maintenance of claimant's accustomed standard of living. Hence a claimant may be dependent although receiving other income from claimant's own work.

5 LARSON'S WORKERS' COMPENSATION LAW § 63.00, at 11–109 (1998). Moreover, maintenance of that standard of living naturally included providing for a child in Ms. Davis's custody.

▐ In sum, there is substantial evidence in the record to support the examiner's finding that Ms. Davis used her husband's money to support herself and their son in order to pay for the mortgage, insurance, utilities, food, and clothing—in short, that she depended upon him financially within the meaning of the statute.

## III.

▐ Under the Act, an employer who controverts the right to compensation must file a notice of intent to controvert "on or before the 14th day after he has knowledge of the alleged injury or death and its relationship to the employment." D.C.Code § 36–315(d). WMATA did not file its Notice of Controversion until March 9, 1994. As this was more than two months after the time limit of § 36–315(d) expired, the Director correctly ruled that WMATA was subject to a 10% penalty for nonpayment. *See* D.C.Code § 36–315(e).

WMATA argues that it lacked notice that controversion would be decided by the hearing examiner because this issue was not contained in the examiner's Pre–Hearing Order. As the record does not include a copy of the Pre–Hearing Order, we cannot substantiate this claim. In any event, at the hearing, Ms. Davis's attorney informed the examiner that

"we did not stipulate that there was timely controversion. As a matter of fact, one of the benefits we requested in our pretrial statement was that it was not controverted timely." Upon learning this, the hearing examiner deleted timely controversion as a stipulated issue (meaning that it remained to be resolved), and WMATA did not object or claim surprise. It cannot do so for the first time on appeal. *See, e.g., Dominique v. District of Columbia Dep't of Employment Servs.*, 574 A.2d 862, 866 (D.C.1990).

## IV.

Asserting that the Director misconstrued the statutory reach of D.C.Code § 36–308(9), WMATA asks us to interpret two provisions which determine whether an employer is entitled to a credit against benefits already received by an employee or his dependent survivor. Specifically, Ms. Davis received life insurance proceeds and pension benefits under plans funded partly by WMATA and partly by the deceased, and WMATA contends that the Director erred in construing the statute so as to deny WMATA a credit for either.

The Act states:

In no event shall the total money allowance payable to an employee or his dependent survivor(s): (1) As compensation for an injury or death under this chapter; (2) as federal old age, and survivors insurance benefits; and (3) from employee benefit plans subject to the Employee Retirement Income Security Act of 1974 (26 U.S.C. § 401 et seq.) and such income maintenance plans solely funded by the employer ... exceed in the aggregate the higher of 80% of the employee's average weekly wage or the total of federal payments and employee benefit plans payments. In the event the total aggregate money allowance payable to an employee or his survivor(s) exceeds this limitation, the amounts otherwise payable as compensation or death benefits under this chapter shall be reduced accordingly.

D.C.Code § 36–308(9). WMATA first argues that it is entitled to a credit for the life insurance proceeds under subsection (2), because they amount to "survivors insurance benefits." Because of the oddly placed comma in subsection (2), the provision is ambiguous: the word "federal" could modify both "old age" and "survivors insurance benefits," or, as WMATA asserts, "survivors insurance benefits" could be a separate category from "federal old age ... benefits." Ms. Davis counters that the first interpretation is the most natural, since "survivors insurance benefits" is "a term of art referring to 'Social Security' death benefits under 42 U.S.C. § 402." As she points out, Social Security encompasses federal old age, survivors, and disability insurance benefits, *see* 42 U.S.C. § 401 *et seq.* (1998), and no reason other than inadvertence has been suggested to us why the District's WCA omits disability benefits from subsection (2).[2] Moreover, the legislative history of the Act lists social security benefits, but not private life insurance plans, as an income category subject to the credit,[3] implying that subsection (2) refers to federal retirement *and* death benefits.

This court will defer to an administrative agency's reasonable interpretation of an ambiguous provision of its governing statute. *Timus v. District of Columbia Dep't of Human Rights*, 633 A.2d 751, 758–59 (D.C. 1993) (en banc); *see also Smith v. District of Columbia Dep't of Employment Servs.*, 548 A.2d 95, 97 (D.C.1988). The Director's conclusion that subsection (2) does not embrace

---

2. Similar set-off provisions in other states specify "federal old age, survivors, and disability insurance," in clear reference to Social Security benefits. *E.g.*, Colo.Rev.Stat. § 8–42–114 (1997).

3. The report of the Committee on Housing and Economic Development states, inter alia:

The Bill provides that compensation benefits are to be reduced if the total amount of money received from Workers' Compensation benefits, *from social security, from employee benefit plans, and from employer funded income main-* tenance plans, taken as a whole, exceed 80% of the employee's average weekly wage or the total of federal payments received by the employee. Thus assuring that no claimant will receive more money for not working than he earns while working.

Council of the District of Columbia, Report of the Committee on Public Services and Consumer Affairs, Bill 3–106, at 12 (Jan. 16, 1980) (emphasis added).

private life insurance proceeds is reasonable, and we therefore sustain it. *See also* 9 LARSON'S WORKERS' COMPENSATION LAW § 97.51(a), at 18–102. ("As to private pensions or health and accident insurance, whether provided by the employer, union, or the individual's own purchase, there is ordinarily no occasion for reduction of compensation benefits.").

WMATA further asserts that the life insurance proceeds should be credited under subsection (3), because they are "from [an] employee benefit plan[ ] subject to ERISA." In support of this claim, WMATA cites the definition of "employee benefit plan" subject to ERISA found at 29 U.S.C. § 1002(1). Such a plan includes

> any plan ... established or maintained by an employer or by an employee organization, or by both, to the extent that such plan ... was established or is maintained for the purpose of providing for its participants or their beneficiaries, *through the purchase of insurance* or otherwise, ... benefits in the event of ... death.

29 U.S.C. § 1002(1) (emphasis added). However, D.C.Code § 36–308(9) by its terms refers not to Title 29 of the U.S.Code, but to "26 U.S.C. § 401 et seq.," part of the Internal Revenue Code, which concerns trusts "forming part of a stock bonus, pension, or profit-sharing plan of an employer," but makes no mention of insurance. 26 U.S.C. § 401(a). Lacking any further indication that the WCA intends to include voluntarily purchased (though employer-subsidized) life insurance among the benefits to be credited against a compensation award, we again defer to the Director's reasonable interpretation that they are not subject to the set-off.

### V.

Finally, like the life insurance proceeds, the pension benefits Ms. Davis received were from a plan partly funded by WMATA and partly funded by Mr. Davis. Relying on *Harold F. Shaner v. W.A. Chester, Inc.,* Dir.

Dkt. No. 89–62, H & AS No. 89–140, OWC No. 5433 (April 2, 1993), and without further discussion, the Director affirmed the hearing examiner's ruling that, under § 36–308(9)(3), "the employer was ineligible [for] a set off of claimant's pension payments because they were from a plan *not solely funded by employer*" (emphasis added). However, in *Mushroom Transp., supra,* we held that *Shaner* is not authoritative precedent on this point and remanded that case to the Director for more careful statutory consideration of whether a credit should be given for pension payments made under a plan subject to ERISA but not funded solely by the employer. 698 A.2d at 433–34. The matter is still before the Director in *Mushroom Transp.* A similar remand is therefore necessary in this case.[4]

### VI.

In summary, we find no basis on which to disturb the Director's conclusion that Ms. Davis is entitled to widow death benefits, the award of a ten percent penalty for late notice of controversion, and the conclusion that WMATA may not receive a credit for the life insurance proceeds. We vacate the Director's decision and remand solely for additional consideration of whether WMATA may receive a credit for Mr. Davis's pension benefits.

*So ordered.*

---

**4.** We decline to consider WMATA's final argument, one not raised at the administrative hearing, that even if Ms. Davis is entitled to benefits as a widow, they should be reduced proportionately with benefits WMATA has paid to other survivors of Mr. Davis. That issue may be considered by the agency in connection with Ms. Davis's June 27, 1996, Motion to Enforce Compensation Order, apparently still pending before the hearing examiner.