Susan PICKREL, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-MENT OF EMPLOYMENT SER-VICES, Respondent.

Star Vending Company and State Farm Insurance Company, Intervenors.

No. 99–AA–712.

District of Columbia Court of Appeals.

Argued April 13, 2000.
Decided Oct. 5, 2000.

Benjamin T. Boscolo, Greenbelt, MD, for petitioner.

Clifton M. Mount, for intervenors.

Robert R. Rigsby, Interim Corporation Counsel, at the time the statement was filed Charles L. Reischel, Deputy Corporation Counsel, and Donna M. Murasky, Senior Assistant Corporation Counsel, filed a statement in lieu of brief for respondent.

Before SCHWELB, FARRELL and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Petitioner Susan Pickrel appeals from the decision of the Director of the District of Columbia Department of Employment Services, who concluded, contrary to the hearing examiner, that petitioner was not entitled to death benefits under the D.C. Workers' Compensation Act because she did not qualify as a "widow" within the meaning of that Act. We affirm the Director's decision, because there was not substantial evidence in the record to establish either that Mrs. Pickrel was dependent on her husband for support at the time of his death, or that what the courts have called a "conjugal nexus" existed between her and her husband at that time.

## I.

Susan and Ronald Pickrel were married in 1980. Mrs. Pickrel moved out of their home in March 1995, and they entered into a formal separation agreement on February 9, 1996. Two months later, Mr. Pickrel was shot and killed by a disgruntled employee at his place of work. Mrs. Pickrel filed a claim for widow's benefits pursuant to the Workers' Compensation Act. Mr. Pickrel's employer, Star Vending Company, and its insurer contested Mrs. Pickrel's claim because she was living apart from her husband at the time of his death.

At the hearing on her claim, Mrs. Pickrel testified that her relationship with her husband had deteriorated in the year before she moved out. She attributed the deterioration, and her resulting decision to leave the marital home, predominantly to her husband's unsympathetic reaction to the fact that she was struggling with depression in connection with her employment and EEOC claims which she had filed. Mrs. Pickrel testified that her husband did not understand her depressive symptoms and was unsupportive and "extremely frustrated" with her. She also stated that during the year before she moved out, her husband occasionally acted violently towards her—throwing a glass, grabbing or pushing her, or hitting her in the arm with his open hand. In the summer of 1994, she testified, she and her husband had an argument in which he stated, "before I'll let you take anything or everything I ever worked for or half of it again that I will kill you and me both before I let, before I see that happen."

After Mrs. Pickrel left the marital home, she continued to have contact with her husband on a sporadic basis. She testified that sometimes they spoke a couple of times a month, while at other times they would not speak for weeks on end. They had telephone conversations that Mrs. Pickrel felt suggested possible reconciliation, and they engaged in sexual relations on approximately three occasions.

No reconciliation took place, however. Instead, Mr. and Mrs. Pickrel executed a formal separation agreement on February 9, 1996. The agreement recited that they were "irreconcilably estranged," that "there is no probability of a reconciliation between them," and that they therefore desired "to effect a full, final and complete settlement of their respective property rights and obligations arising out of their marital relationship." The parties agreed to relinquish all "marital rights" and to "continue to live separate and apart ... as if each were sole and unmarried." The separation agreement bound each party to assume full responsibility for his or her own existing and future debts; to waive any claims for alimony and support from the other; and to waive any rights of inheritance or to benefit from the other's retirement or pension plans or from any bequest in any previously executed will. As part of what the agreement termed a "full and complete property settlement," Mr. and Mrs. Pickrel divided up their bank accounts and other property. They agreed, among other things, that Mrs. Pickrel would convey her interest in the family home to Mr. Pickrel; and that Mr. Pickrel would pay Mrs. Pickrel the sum of $50,000 upon execution of the agreement and an additional $10,000 by August 31, 1996. The parties further agreed that each "shall be free to acquire, use and dispose of his or her own property as though each were unmarried." Finally, Mr. and Mrs. Pickrel waived all grounds for divorce other than voluntary separation; agreed that either party could bring an action of divorce based on voluntary separation after the required statutory period had expired; and waived statutory rights to equitable adjustment of property interests of spouses upon divorce. In entering into this separation agreement, Mrs. Pickrel was represented by counsel.

Mrs. Pickrel testified that after they signed the separation agreement, her husband told her, "[D]on't worry about this.... [Y]ou still get everything if I die

or something." She also testified that after leaving the lawyer's office, she and her husband sat in the car in her driveway and cried, and her husband gave her Valentine's Day candy. However, between February 1996 and Mr. Pickrel's death in April, their only contact consisted of two or three telephone conversations. According to Mrs. Pickrel, she and her husband never discussed divorce at any time, but Mr. Pickrel's sister testified that he intended to file for divorce as soon as the statutory year had passed after execution of the separation agreement.

Mrs. Pickrel testified that she did not have a romantic relationship with another man after leaving the marital home, and that she never saw her husband with another woman. Mr. Pickrel's sister and daughter testified, however, that he had dated two women after Mrs. Pickrel moved out.

Concerning her finances, Mrs. Pickrel testified that she settled her EEOC claims in February 1995, approximately one month before she moved out of the marital home. Pursuant to the settlement, she was reimbursed for attorneys' fees and back pay in May and June 1995, and received an increase in her salary. Unfortunately, her depression impaired her ability to maintain employment, and she was terminated from her position in January 1996. Between March 1995 and February 1996 Mrs. Pickrel borrowed money from her husband on approximately three occasions in order to pay her bills. Mrs. Pickrel testified that she reimbursed Mr. Pickrel for those loans. She also testified that when she asked her husband for money, he told her that she would have to sign a separation agreement. By February 1996, when she executed that agreement, Mrs. Pickrel was several months overdue on her bills and was in a "total financial mess." In accordance with the agreement, howev-

er, Mr. Pickrel paid Mrs. Pickrel the promised lump sum of $50,000, which she deposited in her own separate bank account.

At the time of Mr. Pickrel's death in April 1996, he had not yet removed Mrs. Pickrel's name from certain joint checking and credit card accounts. In addition, Mrs. Pickrel was still named as the sole beneficiary in Mr. Pickrel's will, and was still designated as the beneficiary of two life insurance policies that Mr. Pickrel held. And although Mrs. Pickrel had signed over the deed to the marital home to her husband, he had not recorded the change in title.

The hearing examiner found that Mrs. Pickrel was entitled to workers' compensation death benefits pursuant to D.C.Code § 36–309(2) (1997)[1] because she qualified as a "widow" within the meaning of D.C.Code § 36–301(20) (1997). That section of the Workers' Compensation Act defines "widow" or "widower" to include "the decedent's wife or husband living with or dependent for support upon the decedent at the time of his death; or living apart for justifiable cause or by reason of his or her desertion at such time." As we explained in *Beta Const. Co. v. District of Columbia Dep't of Employment Servs.*, 748 A.2d 427, 430–31 (D.C.2000), a "conjugal nexus" requirement has been read into the "living apart for justifiable cause" prong of this definition. The hearing examiner found that Mrs. Pickrel was dependent upon her husband for financial support because "the decedent was continuing to financially contribute to the claimant, whether calling it a loan or otherwise." In the alternative, the examiner found that Mrs. Pickrel was living apart from her husband for justifiable cause, reasoning "that she left in part due to her own mental condition and a need to be away,

---

1. D.C.Code § 36–309 reads, in pertinent part, "If the injury causes death, the compensation shall be known as a death benefit and shall be payable in the amount and to or for the benefit of the persons following: ... (2) If there be a widow or widower and no child of the deceased, to such widow or widower 50% of the average wages of the deceased, during widowhood, or widowerhood, with 2 years' compensation in 1 sum upon remarriage...."

and in part due to her fear of the deceased, his lack of understanding and support regarding her condition, as well as, whether he might follow through on threats he made to her." And the examiner found that a conjugal nexus between Mr. and Mrs. Pickrel had not been terminated, based on the facts that neither party had sought a divorce, that Mrs. Pickrel was still a beneficiary of Mr. Pickrel, that they maintained contact and had intimate relations after they separated, and that neither had embarked on another permanent relationship.

On appeal, the Director reversed on the ground that the examiner's key findings were not supported by substantial evidence in the record. The Director rejected the examiner's finding that Mrs. Pickrel was dependent on her husband for support at the time of his death because their separation agreement terminated any such dependence, Mr. Pickrel's "loans" to his wife did not constitute "support" because they were required to be repaid, and Mr. Pickrel did not give Mrs. Pickrel any more money after the separation agreement was signed. The Director also concluded that there was no basis for the examiner's finding that a conjugal nexus still existed between Mr. and Mrs. Pickrel after they executed their separation agreement, which by its express terms declared the end of their relationship. In addition, the Director rejected the examiner's finding that Mrs. Pickrel was living apart from her husband for justifiable cause, on the ground that her reasons for leaving the marital home were insufficient to meet the statutory standard.

## II.

■ In reviewing the decision of an agency, this court considers: "(1) whether the agency has made a finding of fact on each material contested issue of fact; (2) whether substantial evidence of record supports each finding; and (3) whether conclusions legally sufficient to support the decision flow rationally from the findings."

*Ferreira v. District of Columbia Dep't of Employment Servs.*, 667 A.2d 310, 312 (D.C.1995) (quoting *Cruz v. District of Columbia Dep't of Employment Servs.*, 633 A.2d 66, 70 (D.C.1993)). Where, as in this case, we review a decision of the Director of the agency reversing a hearing examiner's decision, we must also consider whether the Director exercised proper restraint in his review. The Director is "bound by the Examiner's findings of fact if those findings were supported by substantial evidence in the record, considered as a whole." *Santos v. District of Columbia Dep't of Employment Servs.*, 536 A.2d 1085, 1088 (D.C.1988). The Director must accept those findings of fact which are supported by substantial evidence even if he might have reached a different result based on an independent review of the record. *See id.*

Mrs. Pickrel argues that the examiner's findings were supported by substantial evidence and that the Director exceeded the permissible scope of review by making "entirely new interpretations and findings of fact" on the question of whether she qualified as a "widow" under D.C.Code § 36–301(20). We are constrained to agree with the Director, however, on two points which together are dispositive of this appeal: that the evidence in the record did not support the examiner's findings with regard to either dependency or conjugal nexus.

■ We first consider Mrs. Pickrel's claim that she was dependent upon her husband for support "at the time of his death." D.C.Code § 36–301(20). The question is whether, at that time, "the deceased's contributions were looked to by claimant for the maintenance of claimant's accustomed standard of living." *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Employment Servs.*, 716 A.2d 976, 978 (D.C.1998) (quoting 5 LARSON'S WORKERS' COMPENSATION LAW § 63.00, at 11–109 (1998)). Although there is evidence in the record that Mrs. Pickrel received needed financial assistance from

her husband *before* they entered into their separation agreement, the terms of that agreement belie the notion that she continued to depend on him thereafter. In the agreement Mr. and Mrs. Pickrel divided their marital property, provided that each party was responsible for his or her own debts, and waived claims against each other for support. Pursuant to the agreement, Mrs. Pickrel received a lump sum payment of $50,000 on the date the agreement was signed. The separation agreement revealed an intent on the part of both Mr. and Mrs. Pickrel to dissolve their financial co-dependence. The fact that Mr. Pickrel had not yet made the final payment of $10,000 to Mrs. Pickrel (which the agreement did not require to be paid until the end of August) does not signify that she was dependent on him for support at the time of his death in April. It merely meant that Mrs. Pickrel would have a contractual claim against Mr. Pickrel's estate. Although Mrs. Pickrel testified that she signed the agreement because she was in "desperate financial straits," and that she "never believed that it constituted the end of the marriage," there is no evidence in the record to establish that she was coerced into signing the agreement against her will. And in the absence of substantial evidence that, notwithstanding the agreement, Mrs. Pickrel in fact remained dependent upon her husband for support as of the time of his death, the agreement settles the dependency question. "[C]ertainly there is no reason why a separated wife who has surrendered all right to look to the husband for support while he is living, should upon his death, receive benefits that are intended to replace in part the support which the husband was providing, or should have been providing." *Bass v. Mooresville Mills*, 11 N.C.App. 631, 182 S.E.2d 246, 248 (1971). The Director correctly rejected the examiner's finding that

Mrs. Pickrel was dependent upon her husband at the time of his death.

We turn to the issue of whether Mrs. Pickrel qualified as a "widow" because she was living apart from her husband for justifiable cause. We have rejected the old, restrictive notion that justifiable cause is "substantially equivalent to 'a matrimonial offense,'" *Weeks v. Behrend*, 77 U.S.App.D.C. 341, 342, 135 F.2d 258, 259 (1943), in favor of a construction that focuses on whether "the wife's departure can be said to be defensible in the circumstances." 5 LARSON's WORKERS' COMPENSATION LAW § 96.06[3] (1999). *See Beta Const. Co.*, 748 A.2d at 430–31 & n. 5 (holding that claimant had justifiable cause to move out where the decedent refused to contribute financially to the household). *See also New Valley Corp. v. Gilliam*, 338 U.S.App.D.C. 151, 156, 192 F.3d 150, 155 (1999); *Matthews v. Walter*, 168 U.S.App. D.C. 27, 30, 512 F.2d 941, 944 (1975). While the question in this case was perhaps a close one, we think that the hearing examiner's determination that Mrs. Pickrel had justifiable cause to live apart from her husband was supported by substantial evidence.[2] We therefore do not affirm the Director's decision on this ground.

However, following the decision of the Supreme Court in *Thompson v. Lawson*, 347 U.S. 334, 74 S.Ct. 555, 98 L.Ed. 733 (1954), we held in *Beta Const. Co.* that justifiable cause is not enough. There must in addition have been what the Supreme Court termed "a conjugal nexus between the claimant and the decedent subsisting at the time of the latter's death," *Thompson*, 347 U.S. at 336–37, 74 S.Ct. 555; *see Beta Const. Co.*, 748 A.2d at 430–31. The D.C. Circuit has explained that *Thompson* requires an evaluation of the "bond in reality between husband and wife":

---

2. "Substantial evidence means 'more than a mere scintilla' and such that reasonable minds might accept it as adequate to support a conclusion." *Dominique v. District of Columbia Dep't of Employment Servs.*, 574 A.2d

862, 866 n. 3 (D.C.1990) (quoting *Vestry of Grace Parish v. District of Columbia Alcoholic Beverage Control Bd.*, 366 A.2d 1110, 1112 (D.C.1976)).

Thus the rule is now settled that to be entitled to an award as a widow a woman must have continued to live as the deserted wife of an employee who has deserted her; there must be a bond in reality between husband and wife in their relation to one another. The essential ingredient in her claim is her real status, speaking factually, in respect to the deceased, not the existing legal formalities of the relationship. We read the opinion in the *Thompson* case to mean that the critical inquiry is the right on the part of the woman to compensation. Has the woman in reality a right to compensation on account of the death of the man? Her technical relationship to the deceased is not the criterion.

*Liberty Mut. Ins. Co. v. Donovan,* 95 U.S.App.D.C. 49, 51, 218 F.2d 860, 862 (1955).

 In light of the separation agreement that Mr. and Mrs. Pickrel executed, we must affirm the Director's conclusion that there was no substantial evidence in the record to support the examiner's finding of an existing conjugal nexus at the time of Mr. Pickrel's death. Even assuming that a conjugal nexus continued to exist for some time after Mrs. Pickrel left her husband (and the evidence. suggests that it did), the separation agreement extinguished that nexus. There is simply no other way to read an agreement that unambiguously states that "the parties are irreconcilably estranged, and there is no probability of a reconciliation between them"; that "it is their desire to effect a full, final and complete settlement of their respective property rights and obligations arising out of their marital relationship"; and that they "shall continue to live separate and apart ... as if each were sole and unmarried." That Mr. and Mrs. Pickrel were not yet divorced does not mean that a conjugal nexus still existed. Whatever Mrs. Pickrel's hopes may have been, the separation agreement explicitly contemplated that the parties would be divorced

as soon as the statutory waiting period had elapsed. Other courts have concluded that "justifiable cause ... may not be interpreted as applicable to separations by mutual consent," *Bass v. Mooresville Mills,* 182 S.E.2d at 248 (citing cases); *accord, Sloop v. Williams Exxon Serv.,* 24 N.C.App. 129, 210 S.E.2d 111, 112 (1974). We agree that where the parties entered into a separation agreement which erased any claim of an existing conjugal nexus, it is irrelevant that the claimant was living apart from the decedent for justifiable cause. Absent any evidence in the record that a conjugal nexus was revived subsequent to the execution of the separation agreement, we must therefore agree with the Director that Mrs. Pickrel was not a widow under the justifiable cause prong of D.C.Code § 36–301(20).

The decision of the Director is, accordingly,

*Affirmed.*